PAUL WACK v. F. E. SCHOENBERG MANUFACTURING COMPANY, a Corporation, Appellant.—53 S. W. (2d) 28.

Division Two, September 28, 1932.

*Wayne Ely* and *Tom Ely, Jr.,* for appellant.

200

*Everett Hullverson* and *Staunton E. Boudreau* for respondent.

WHITE, P. J.—The appeal is from a judgment recovered by the plaintiff for injuries incurred in falling into an elevator shaft while employed by defendant. The petition alleged that defendant manufactured articles of wood and employed plaintiff at its plant in the city of St. Louis. That August 16, 1926, while plaintiff was so employed "and engaged in his duties," another employee, McClelland, who was habitually negligent and a practical joker, as the defendant knew or by the exercise of ordinary care could have known, jumped on plaintiff's back causing him to fall against the gate guarding the elevator shaft, crash through the gate and fall into the shaft, thereby incurring serious injury. It is alleged that the elevator gate was insecurely fastened, the guide pieces constituting the runway old, loose, weak, worn and broken, so that a person bumping into or falling against the gate would be likely to cause the gate to be released from the runway; that the gate was not the full size of the opening, was constructed of old, weak and worn lumber, was not sufficiently braced and was placed loosely in the runway; that the defendant negligently, and in violation of Ordinance No. 34,950 failed to equip said gate with a device called an interlock which would prevent its opening

unless the elevator platform were at rest within six inches of the floor of the landing.

The defendant after a general denial pleaded contributory negligence, and alleged that neither the plaintiff nor George McClelland, at the time of the incident, was acting within the scope of his employment. There was a verdict for forty thousand dollars. The court overruled the motion for new trial on requiring *remittitur* of $18,000. Judgment was entered for $22,000.

I. Appellant first assigns error to the failure of the court to declare a mistrial and discharge the jury because of improper questions asked of the jury panel on the *voir dire* examination. Mr. Hullverson, attorney for plaintiff, out of the hearing of the jury asked counsel for defendant if the Fidelity & Casualty Company, or any other insurance company, were interested in the outcome of this case, saying that he desired to interrogate the jurors and determine whether any one of them was interested in that company or anybody connected with the company. Mr. Ely for defendant refused to answer the question and objected to it. Mr. Hullverson then was sworn and introduced a letter which he had received after writing the defendant that he represented Mr. Wack in this case. The letter received by Hullverson was on the letterhead of the Fidelity & Casualty Company and signed by Mr. Hodgman, an attorney of St. Louis, in which letter Mr. Hodgman acknowledged receipt of Hullverson's letter addressed to the defendant and stated that Hodgman represented the defendant in the case. Mr. Hullverson was then asked by the defendant's counsel if he had reason to believe any member of the panel was interested in any way or employed in any way by that company. In the colloquy which followed Mr. Hullverson stated that in a previous trial of the case a man or two connected with insurance companies was on the panel.

In the presence of the jury the following question was asked:

"Q. Do any of you gentlemen know any of the claim agents or employees of the Fidelity & Casualty Company of New York, an insurance company, with offices in the Pierce Building?

"Juror No. 12: Are they represented by Hoffman?"

There being no objection to plaintiff's question the examination proceeded, and juror No. 3, in answer to a question said that he knew Mr. Wyatt and Mr. Norris who wrote insurance. He thought one of them wrote accident insurance; he was not positive but thought it was for the Fidelity & Casualty Company.

After further questioning the examination continued as follows:

"Q. Does anyone else know any one of the officers or claim agents or agents of the Fidelity & Casualty Company? Do any of you know any of the officers or agents? Do you know Mr. Hodgman, head of

the organization in St. Louis, G. A. Hodgman? Do you know any agent by the name of Mr. Filley, who is up there?

"MR. ELY: I object to any further questions. The gentlemen have said they do not know anyone connected with the company except as indicated, and I don't think it is proper.

"MR. HULLVERSON: They may not know that the men I ask about are connected with the company or not.

"MR. ELY: If they don't know, it won't make any difference.

"MR. HULLVERSON: I just want to know if they know these men.

"MR. ELY: I object to any further questions along that line.

"THE COURT: I may have to stop this case pretty suddenly, Mr. Hullverson, if you pursue this line of inquiry further.

"MR. HULLVERSON: If your Honor thinks I should not, I won't.

"MR. ELY: I move that a mistrial be declared on account of the disobedience to the court's injunction in the first instance.

"THE COURT: The request will be denied at this time."

After further questions this occurred:

"MR. HULLVERSON (addressing jurors): Has anyone else had a suit filed against them? Has any gentleman made a claim against any of you gentlemen, a claim for damages, perhaps by reason of you operating an automobile? You might have crashed into some one or some one had their property damaged by you. Has that occurred, so that some one has made a claim which didn't go to suit?

"JUROR No. 3: I had an automobile accident.

"MR. HULLVERSON: I assume you had insurance on your automobile?"

Defendant's counsel objected to the last question and moved that a mistrial be declared. The question was not answered. The court denied the motion.

It is assumed that a jury would be more favorable to a plaintiff in suing for personal injuries if the jury knows the defendant to be protected by insurance and generally it is improper to get that information before a jury. However, a plaintiff in such case has a right to know the relation of members of the panel to anyone who is interested in the result of the suit, and to make inquiries to ascertain such relationship if made in good faith although it reveals that an insurance company is defending the suit. [Maurizi v. Western Coal & Mining Co., 321 Mo. 378, 11 S. W. (2d) 268; Bruce v. East Side Packing Co., 6 S. W. (2d) 986.] There appears to be no question of the good faith of the plaintiff's counsel in this case because out of the presence of the jury he showed that the Fidelity & Casualty Insurance Company was interested in the case, and his questions to the jury were as to their knowledge of claim agents, officers and employees of that company.

The interest of the Fidelity & Casualty Company in the defense was the only thing in connection with the matter which would be prejudicial to the defendant. That information went before the jury without objection. The plaintiff had a right to know whether the members of the panel knew the officers or agents of that Fidelity Company. The extent of that acquaintance could be inquired into just as a juror may be asked about his acquaintance and his relationship with anybody connected with the defense.

There was nothing in any question which would convey to the jury any information which they did not already have, that the Fidelity & Casualty Company was behind the defense.

When Juror 3 stated that he had an automobile accident the plaintiff's attorney asked: "I assume you had insurance on your automobile?" This was objected to as injecting insurance into the case. The question could have no prejudicial effect because already it was before the jury almost as plainly as if it had been stated directly that the Fidelity & Casualty Company was interested in the result of the suit.

The statement of Juror 3 that he had an automobile accident seemed to indicate that his own automobile was damaged or that it had damaged some other person's property. Whether he was protected by insurance or not might affect his attitude as a juror in a damage suit. The court did not err in refusing to discharge the jury. No remedy short of that was asked by the defendant. We do not see that the question of Mr. Hullverson was improper. It was harmless.

II. Barth Staehlin, elevator inspector for the city of St. Louis, testified that he inspected the elevator gates May 3, 1926; that the guide rails were worn. He said:

"I sent them (meaning defendant) notice telling them to install new gates thereto."

Certificates of inspection from his report shown by Exhibits C and D were introduced. In Exhibit C appeared the question:

"Do you recommend that certificate of safety be issued?" The answer was ".No."

Exhibit D was a copy of Staehlin's letter telling the defendant to install new gates in the elevator.

Defendant objected to this testimony, claiming that it was too remote. The witness had not examined the gates after May 3rd, while the accident occurred August 16, 1926. Inspections, however by other inspectors were shown by exhibits H, I, E, F and G. Exhibit F was dated November 22, 1926, and the others dated at different times during 1927.

Plaintiff's Exhibit M was a letter from Inspector Rubeling, July 31, 1926, to defendant instructing it to make repairs on the elevator. A copy of the letter is not in the record.

The evidence of Staehlin was competent, showing the condition of the gate a little more than three months before the accident because it brought notice to the defendant of the defective condition of the gate. The testimony of Rubeling and the reports of other inspectors showed that the gate continued in that condition until the accident and afterwards.

■ III. The plaintiff's counsel asked witness Dr. Will, a hypothetical question which with the answer was as follows:

"Q. Assume that this young man has severe pain" (then follows a detailed statement of certain pains claimed to have been suffered by plaintiff) "he had nothing else the matter with him outside the injury and those attacks occur, would you assume that there must be some connection between his attacks and this injury, assuming that he suffered concussion of the brain when he fell? A. Assuming all these things to be true it is within the possibilities; yes sir."

The defendant moved that the question and answer be stricken out "because it indulged in possibilities and not in probabilities." The court overruled the motion and the ruling is assigned as error. As defendant's witness the doctor had testified about his examination of the plaintiff and the nature of his injuries. In that examination he said he discovered no pains which are hypothesized in the question. The effect of his testimony was that Wack was not hurt so seriously as he claimed. Even if the appellant's theory that possibilities are not competent as evidence, the question was entirely proper on cross-examination in order to show that certain results from the injury under consideration could have occurred although the witness did not observe them. The evidence was admissible and would have been even if it had been brought out in direct examination. The general rule is that "A witness of suitable experience, who is competent to form a reasonable inference, may state . . . . whether certain acts, consequences, events, or operations would be possible; whether any other acts would have been possible and, if so, what acts; or whether the consequences could have been produced in any other way." [22 C. J. p. 623.]

■ Appellant cites O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55, where the opinion considered the question at length and clarified former confusion in some rulings. It had been held in several cases that an expert should not be allowed to testify that certain consequences *were caused* by stated acts or occurrences, as ascertained results from a given injury, on the ground that an answer would invade the province of the jury. That doctrine was overruled. It was held, as it was also in Taylor v. Met. Street Ry. Co., 256 Mo. l. c. 209, 165 S. W. 327, that an expert could properly testify that in his opinion a given injury *would* cause certain pathological effects.

The Taylor ruling turned upon a distinction between an opinion by an expert that a certain effect *would* result from a certain act, and an opinion that such effect *might* or *could* result. The O'Leary ruling went all the way and held that the expert might testify that in his opinion certain effect *was caused* by the act complained of. The jury's duty to determine the fact remained the same. It could believe or disbelieve the testimony. The court held that the expert's opinion as to what might or could happen did not make out a submissible case; that there must be evidence that it would or did happen. Yet, expert evidence of the possibility is always admissible, though alone it does not make out a *prima-facie* case.

That such result might or could occur predicates a mere possibility; if the expert says it *would* occur he asserts a probability. An expert opinion that probable or possible effects arise from a given cause is always admissible.

Mahany v. Kansas City Rys. Co., 286 Mo. 601, 228 S. W. l. c. 827, is where an opinion as to possibilities was held to be incompetent. That is contrary to the ruling in the O'Leary case.

■ IV. Appellant assigns error to certain testimony of Dr. Pernoud. He stated that he made an examination of the plaintiff with reference to his brain, but could find no objective conditions. Over the objection of defendant he was permitted to tell what objective conditions are: "That is anything that I could find myself, regardless of what the patient told me." The witness then being asked whether he could tell how serious a concussion of the brain is, said there were means of determining. "If a person becomes completely unconscious and remains so for a long time, and if the pulse becomes very slow and there is evidence of a great shock and the skin becomes clammy and congested. . . ."

Counsel for defendant objected "to the lecture" because the witness had never seen the plaintiff until two years after the accident. The witness was testifying as an expert and explaining the symptoms which appear as evidence of the extent of an injury. The evidence was admissible.

■ V. The case was submitted by an instruction on the insufficiency of the gate to guard the elevator shaft against injury to persons coming in contact with it "in the ordinary course of business" and "in the course of work being performed about the place." No other ground of negligence was submitted to the jury. It is claimed that the evidence was insufficient to submit that issue.

In order to constitute an actionable, proximate cause of such an injury, it must have been the natural and probable consequence of the negligent act complained of. The accident must have been one

which the defendant had reason to anticipate. It is not necessary that the defendant should anticipate the particular incident and injury which occurred, but that the gate was in a condition such that it was likely to give way to the brushing and pressing against it of men in the ordinary course of their employment.

The reason for requiring elevator gates was to prevent persons from falling into the shaft when the elevator was not at the landing. Naturally such gates would be useless unless they were of sufficient strength to resist ordinary pressure of persons passing around. The plaintiff was scuffling with George McClelland. Defendant introduced evidence to show that while McClelland was upon the plaintiff's back plaintiff backed against the gate and pushed the gate open so that both went to the bottom of the shaft. Plaintiff testified that when George McClelland jumped upon his back he was thrown forward "about 10 feet or so," that he was bent over, was about two feet north of the elevator shaft when McClelland got off his back but still had one hand on plaintiff's shoulder. Plaintiff staggered to the right and when he saw the gate give way he snatched for Mc-Clelland and both went down; that just a part of plaintiff's weight went against the gate.

Plaintiff introduced witness John Rubeling, boiler and elevator inspector, who inspected the gate July 31, 1926, a little more than two weeks before the accident. He testified:

"I remember from my own knowledge that this gate was weak and wobbly and the strips or guard rail were worn. The gate could be jumped out of the groove or guard rail. I pushed against it and it jumped out of the groove. There was nothing wrong with the gate at the time I made the inspection, except that it was wobbly and weak and came out of the socket. I went down there two days after this accident and Mr. Neu demonstrated how the accident occurred. The gate was in the same condition as when I first saw it. There was no interlocking device on the gate at that time."

He then testified that he sent a form letter to the defendant July 31, calling for changes to be made in compliance with the ordinance, and said further:

"It is apparent to me that the guide rails were out too far to hold that gate in. I think the gate would stand fifteen or twenty pounds pressure without jumping out. I think that I could spring this gate if it were in its guide rails. The guide rails were deep enough, but too far apart. I sprung the gate out July 31st, and in my report I didn't mention the fact that new guide rails were needed. Whenever I inspect any place and find anything wrong I turn in a report on it; I didn't put anything about guide rails in my report here."

A gate that would yield to a pressure of fifteen or twenty pounds certainly was not safe for people passing around and in front of it.

A man might stumble against it or might playfully be pushed against it, might back against it and be precipitated to the bottom. With a gate as frail as that the employer should reasonably anticipate that some injury would occur on account of its weakness. The gate was wobbly and weak and likely to spring out of the grooves. The very thing that happened.

Plaintiff testified that when workmen brought screens down in the elevator the screens would be set in the runway between the elevator hatch and the east wall in a way that there would be a space of only six inches between the elevator and the screens. He probably meant the foot of screens resting on the floor as they leaned against the opposite wall. "You had to creep through." The plaintiff's evidence tended to show that it was necessary in the ordinary course of their work for men to pass by the elevator shaft, between it and the screens stacked against the opposite wall, and at times to press against the gate. Naturally a man moving frequently in front of the elevator would be likely at any time to press against it or stumble against it with a pressure of more than fifteen or twenty pounds. A case was made out on the issue submitted.

■ VI. In that connection appellant objected to the introduction of Ordinance 34950, on the ground that it was not material to the issues. Section 23 of the ordinance is set out at length. It relates to interlocks required in elevators which would prevent the movement of a car unless all the shaft way doors or gates are within two and one-half inches of being closed. The section closes with this statement:

"Any force or forces used to perform any interlocking function shall be arranged so that their failure to cause the interlocking action shall prevent the movement of the elevator car."

As the elevator went up or came down it would lock the elevator gate so that when the elevator was away from it the gate could not be opened. The point is that the gate gave way because of the pressure against it and not because of the absence of or weakness in the interlocking device.

Mr. Staehlin, when asked whether a gate of that character could be opened by someone falling against it if the interlocking device were working properly, answered: "Well, that depends upon if the guide rails are in good condition; it will strengthen it that much on one side." He said further: "You could not put an interlock on that gate because the gate is not in height and the openings are too large." His evidence indicates that the interlocking device would strengthen the gate against pressure and the very weaknesses of the gate would have to be remedied in order to make the interlocking device workable.

Plaintiff testified:

"The gate was old and wobbly. It went up, and when it came out of the grooves it swung in towards the pit and the weights pulled it up. I touched it with my shoulder and it went in and up. It went in first and then went up."

He said that when the gate came out of the grooves it swung inward and "the weights pulled it up." There was no attempt in the cross-examination to have that statement modified. There was no attempt to show by any witness that the result described could not have happened. So it is reasonably inferable that the lacking interlocking device, if it had been attached, would have prevented the swinging in and the consequent pulling up of the gate. The ordinance requiring an interlocking device was admissible because it would strengthen the gate to some extent; besides, necessary repairs, in order to make it workable, would make it still stronger against pressure.

■ An objection to Instruction No. 1, for plaintiff, carries the same objection. It required the jury to find that persons coming in contact with the gate "in the ordinary course of business" would be likely to cause the gate to give way. It is not contended that the plaintiff was not pursuing the ordinary course of his employment at the time the accident occurred. It is claimed only that the particular act which occurred was outside the scope of plaintiff's employment because McClelland had sprung upon the plaintiff's back and in an effort to get him off they went together against the gate and pushed it open.

It is argued that it was not the defective gate but the negligent act of plaintiff in "butting against the gate, together with the weight of McClelland" which was the proximate cause of the injury.

There is no evidence that plaintiff voluntarily entered into a "scuffle" with McClelland and it is fairly inferable from his evidence that he staggered against the gate after McClelland got off his back and in trying to recover his balance he drew McClelland with him into the pit.

Defendant pleaded contributory negligence on the part of plaintiff but asked no instruction submitting that issue to the jury. If it had been submitted the jury could very well have found that plaintiff was not negligent. Contributory negligence is eliminated from consideration.

The court gave at the instance of the defendant an instruction declaring that it was under no obligation to control the rough play which its employees might "indulge in outside the line of their employment." This on the theory that when McClelland jumped on plaintiff's back he jumped out of the "line of his employment," and carried plaintiff with him outside the line of plaintiff's employment.

Plaintiff was pursuing his duties when McClelland jumped on his back and he did not abandon his duty while staggering under that burden and endeavoring to shake it off so that he could resume his work.

The argument assumes that an employee momentarily interrupted in his duties by some external agency which at the same time causes him to be injured, is not in the course of his employment when injured.

■ It is not necessary that the defective gate should be the sole cause of the injury. The appellant cannot escape liability caused by its defective gate on the ground that another's negligence concurred in producing the injury. [Carr v. Auto Supply Co., 293 Mo. 562, l. c. 569, 239 S. W. 827; Brennan v. City of St. Louis, 92 Mo. l. c. 486, 2 S. W. 481; 45 C. J. 920-23, 930.] Likewise, if McClelland's negligence as a fellow-servant be considered a cause of the injury, such injury could not have occurred if the gate had not been defective. The combined negligence of the master and a fellow-servant does not relieve the master of liability. [Cole v. St. Louis Transit Co., 183 Mo. 81, 81 S. W. 1138; Johnson v. American Car & Foundry Co., 259 S. W. l. c. 444; Snyder v. American Car & Foundry Co., 322 Mo. 147, 14 S. W. (2d) l. c. 606.]

■ Appellant claims error in the refusal of Instruction C. It is based on the theory that the defendant was not negligent in keeping in his employ a pranky fellow like George McClelland, unless the defendant had knowledge of it and the pranks were of such a nature as would cause an ordinarily careful person to anticipate injury. While the petition alleged that the defendant was negligent in that respect that ground of negligence was not submitted to the jury. The case was submitted solely on the ground of the alleged weakness of the gate and negligence of defendant in failing to use ordinary care to make it safe. The instruction was properly refused.

■ VII. It is further claimed that the verdict is excessive. The verdict for $40,000 was reduced in the circuit court by *remittitur* of $18,000, leaving judgment for $22,000. The evidence showed that the injuries to plaintiff were permanent. He was insensible from the concussion, woke up in the hospital; the physicians observed injuries to the nerves and to the spine; there was a fracture of the eighth and ninth vertebrae, a permanent injury to his back; he had a definite stoop, called cyphosis; the whole of the spine about the ribs was quite rigid. The knee reflexes below the knee cap were exaggerated—were more active than normal. All these injuries were shown by X-rays. and observed two years after the accident. He was thirty-three years of age at the time of the accident and was earning $1,500 a

year. He expended $250 for medical bills. Under the circumstances we think the court did not abuse its discretion in overruling the motion for new trial after the *remittitur* mentioned.

The judgment is affirmed. All concur.