MIKE J. COLWELL v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.—73 S. W. (2d) 222.

Division Two, June 19, 1934.

*E. T. Miller, A. P. Stewart* and *C. H. Skinker, Jr.,* for appellant.

*Allen, Moser & Marsalek* for respondent.

FITZSIMMONS, C.—Appellant railway company appeals from a judgment for $20,000 damages which respondent Colwell recovered in the circuit court, city of St. Louis.

The cause of action was grounded on the Federal Safety Appliance Act. The amended petition charged that the hand brake on a certain box freight car which appellant was hauling in its St. Louis yards and on top of which respondent was performing his duties as a switchman, was so defective, insecure and inefficient that, while respondent was attempting to use the brake, it suddenly and rapidly spun around and caused respondent to lose his balance and fall to the ground and thereby to receive the injuries for which he sued.

I. Appellant stresses most vigorously its assignment that the trial court erred in overruling the demurrers to the evidence. It is insisted that respondent's evidence was insufficient in kind or amount to support the violation of the Federal Act charged. Both sides agree that on the night of September 11-12, 1928, respondent was a switchman employed by appellant. The crew consisted of an engineer, fireman and three switchmen. Of these switchmen H. S. Carrigan was the head man or pin-puller who worked near the engine. W. H. Akers was the foreman and respondent, Mike J. Colwell was the field man. About one o'clock in the morning of

September 12, the engine was slowly pushing a box car eastwardly on track one to an unloading platform of the Kroger Grocery & Baking Company in St. Louis. Carrigan was on top of the car. When the car came within a few car lengths of the spot where it was to be stopped, respondent, who had been throwing switches so as to set a right course for the car and had been ahead of the car, met the car advancing and climbed to the top. Both sides agree that the car had two ladders, one on the north side next to the west end, and the other on the south side next to the east end, and that Colwell climbed the ladder on the south side near the east end. Carrigan and Colwell saw each other on top of the car, which we will call the Union Pacific or U. P. car. It is not disputed that Colwell lost his balance while he was on top near the east end of the U. P. car on track one and that he made a step of three or four feet to the top of a Missouri Pacific box car on track two. He did not recover his balance there and he tried to step across a space between the Missouri Pacific car and a Cincinnati Northern box car which was east of and on the same track with the Missouri Pacific car. But the Missouri Pacific car and the Cincinnati Northern car were not coupled together. The space between them was six or eight feet wide. Colwell, in his attempt to reach the third car, pitched downward, struck the draw head of that car and suffered severe injuries.

Both parties agree also that there was but one brake staff, with lever wheel, ratchet and dog, on the U. P. car. But the point of difference is whether the brake staff and attachments were at the west end of the car forty feet from Colwell when he reached the car roof or at the east end where he lost his balance and whence he sprang to the second car, only to fall upon the drawhead of the third car. Another point of difference in the testimony is whether the brake staff and attachments were on top of the U. P. car or were on a brake platform below the car roof.

The part of the brake, involved in this accident, consisted of a vertical staff, a ratchet, a dog and a lever wheel. Colwell testified that it was his duty to "line" all switches necessary for the route of the car and, after he had completed that task, to climb to the roof of the car and set or apply the hand brake. The car had to be braked in order that it be stopped at a particular point next to the unloading platform and prevented from rolling down grade. He climbed to the roof of the U. P. car by way of the southeast ladder to set the brake which, he testified, was on the east end. Concerning what happened when he reached the east end of the roof of the car, Colwell, on direct examination testified:

"Q. You say you had gotten ready to set the brake? A. I had set my lantern down with one hand and was reaching over to get the brake wheel with the other. I had set the lantern down.

"Q. What, if anything, caused the brake to release, if you know?

"Mr. Skinker: I object to that as calling for the conclusion of the witness and invasion of the province of the jury.

"The Court: He may answer, if he knows. Objection overruled.

"Q. The dog was loose. Sometimes they will do that. They will work it when you shove a car with the brake set. It will wear it running. If you put your hand on it in braking, it will move the dog in it and release it. When the brake releases it revolves rapidly, if the brake is set very tight."

Switchman Carrigan, who by his testimony and that of Colwell, was atop the car when Colwell came up the ladder, testified for defendant that he set the brake before Colwell boarded the car. But Carrigan also testified that the brake was at the west end of the car and had no part in Colwell's fall. Colwell further testified on direct examination:

"Q. Explain to the jury what the dog and ratchet of a handbrake are for. A. The ratchet is a little cog wheel about that big around (indicating), fastened to the brake staff; and the dog is a little piece of iron, about that long (indicating), and about an inch thick, and sharp at both ends. As you put your foot against the dog it holds it against the ratchet when being braked and keeps the dog in the cog of the ratchet, and, when you get the brake as tight as you can, the dog holds it.

"Q. On this particular brake you said that the dog was loose?

"Mr. Skinker: We object to that. He stated, as I understand his testimony, that he didn't see the dog or ratchet. He is just stating his conclusion.

"Mr. Moore: He didn't state anything of the sort. That was the objection which was made, and your Honor told him to answer if he knew.

"The Witness: The dog was loose, because the brake couldn't release unless it was—the dog or ratchet.

"Mr. Skinker: I object to that as a conclusion of the witness and an invasion of the province of the jury, and move that it be stricken out.

"The Court: Objection and motion overruled."

Colwell also stated that he had had fifteen years' experience as a brakeman and switchman.

On cross-examination respondent Colwell made it very clear that he paid no attention to the dog and ratchet and in fact did not look at them; that if the brake is properly set it will unwind if it is defective; that he did not see anything defective in the brake but he could feel it when the jar came and tore the brake wheel out of his hand. He also stated, on cross-examination, that the fact that the brake wheel turned when he laid his right hand on it caused

him to believe from his experience in handling brakes that there was some defect in the brake. When counsel for appellant inquired what that defect was, respondent answered: ''It was either the dog or the ratchet. The pin came out of the ratchet and caused the ratchet to be loose, and the dog could be worn so that it will flop up and down.''

On redirect examination, Colwell testified that he did not touch the dog.

Albert Mellner, called by respondent, testified that he had had twenty-three years' railroad business and was familiar with hand brakes. He stated that if the set brake became loose when respondent took hold of the wheel and leaned upon it, this result, in his opinion, was due to a loose ratchet or dog. William Donaldson who also qualified as an expert on hand brakes gave the same opinion testimony. Appellant assigns error to the admission of the opinion testimony of respondent, and of witnesses Mellner and Donaldson as statements of conclusions and invasions of the province of the jury. We will consider this assignment in due time.

On behalf of appellant, H. S. Carrigan, the head switchman, who, it is undisputed, was standing on top at about the center of the U. P. car, when Colwell climbed up at the southeast corner, testified that, when he saw that Colwell was about to ascend, he, Carrigan, had set the brake, and he informed Colwell that he, Colwell should remain on the ground. But Colwell came up, lost his balance when he reached the roof, staggered back, and stepped across to the roof of the Missouri Pacific car on track 2. He did not regain his balance there and fell when he attempted to step to the roof of the second car on track 2. Carrigan was positive in his testimony that the hand brake was at the west end of the U. P. car, and not at the east end as Colwell testified, and that neither that brake nor the brake on either of the two cars on track 2 was within forty feet of Colwell when he fell. Carrigan also testified that he was present about noon of September 12, when photographs of the three cars were taken; that the cars then were in the same position as at the time of the accident, and that the end of the U. P. car, exhibited in two pictures in the record before us, is the east end. Hand brake equipment is not visible at the end of the Union Pacific car which the photos present. The photographer testified that the pictures exhibit the east end of the U. P. car.

The engineer of the engine which was attached to the U. P. car testified that from the time of the accident until he quit work at seven A. M., September 12, the U. P. car was not moved. The foreman of the day crew who went on duty at seven A. M., September 12, testified that the position of the U. P. car was not changed prior to the taking of the photographs. W. M. Akers, foreman of the night crew to which Colwell belonged, testified that the brake staff of the U.

P. car was at the west end. M. J. Reynolds, an inspector who examined the car within an hour after the accident, stated that the brake staff was at the west end and that the brake was set and in good order. He also stated that the brake staff and wheel were not upon the roof of the car but upon a platform which was lower than the roof and projected from the east wall of the car. L. R. Schuette, an inspector who saw the car on the afternoon of September 12, after it had been moved to another point in the yards, testified to the same effect. On cross-examination Carrigan, the head switchman, admitted that he signed a statement at the instance of respondent's counsel, in which he said: "The last I saw of Mike Colwell before he was hurt he was on top of a box car near the hand brake." On redirect examination he testified that the statement quoted was not true. On cross-examination Carrigan also stated that there was a turn table within 1000 or 1200 feet of the point where the accident happened.

Appellant argues in behalf of its demurrer thus: "Can plaintiff put a hand brake on a car at the end from which he fell by merely saying there was a hand brake there? Can plaintiff create a defective dog or ratchet by stating his conclusion that the dog or ratchet was defective because the wheel of the hand brake turned or spun when he took hold of it? Is this court bound to accept such testimony to the extent of saying that it created a jury question, notwithstanding all of this evidence, including photographs of the end of the car from which plaintiff fell, showing that there was no hand brake on that end of the car?"

To these questions appellant answers "no" with vehemence, and cites authorities.

The demurrer presents two phases. The first is the quantitative force of the evidence that respondent was caused to fall by the turning of a brake wheel on the east end of the U. P. car. The second is the evidential value, if any, of the opinion testimony of respondent and of his witnesses, Mellner and Donaldson, as to the cause of the spinning of the brake wheel.

We examine the first phase. Only respondent and Carrigan testified to the fall. Akers, foreman of the crew, Abel, the engineman, and Smith, the fireman, did not see Colwell fall. Respondent and Carrigan agree that the fall was from the east end of the car. Respondent testified that the hand brake, the wheel and staff of which were located at the east end of the car, caused him to fall. Carrigan testified that the brake staff and wheel were at the west end and had nothing to do with the accident. The engineer, the switching crew, foreman, two car inspectors and the photographer testified that the staff and wheel were at the west end. The photographs do not prove themselves nor do they orient the car. We look alone to the testimony of the witnesses to learn that the pictures are of

502

the east end of the U. P. car. In this state of the case we are obliged to rule that there was substantial evidence, if believed by the jury, to prove that respondent was caused to fall by the turning of the brake wheel on the east end of the car. Appropriate here is the language of GRAVES, J., in the opinion of this court in the case of Keller v. St. Louis Butchers' Supply Co. (Mo.), 229 S. W. 173, l. c. 175:

"The one question under the pleadings is: Had the defendant furnished a guard for the saw? The great weight of the evidence shows that such a guard was on the machine for use by the employees. One cannot read this record without concluding that plaintiff stands alone on this question, and without having strong suspicions that he has prevaricated in his own interest. But his evidence is there, and what shall we (an appellate court) do with it?

"We have heretofore ruled that the credibility of the witnesses is a matter for the jury. [Cases cited.] On the other hand, we have ruled that, if the trial court sets aside the verdict upon the ground that it is against the weight of the evidence, we will not disturb such ruling. [Kinlen v. Railroad, 216 Mo. l. c. 176, 115 S. W. 523.]

"Not only so, but we have said that it was the peculiar function of the trial courts to set aside verdicts as being against the weight of the evidence, and have a time or so admonished them as to this peculiar duty, and even criticised them for not promptly setting aside such verdict; i. e., against the weight of the evidence. [Cases cited.] This because the situation of a trial court was such as to better fit them for this duty, and further the law has imposed upon them such duty. [Cases cited.]"

We have examined the Federal cases which, appellant insists, control. They do not prompt us to change the quoted rule. A circuit court, made up of a jury and a judge, passed upon the facts in this case. We do not find that we should use our power to annul their verdict and judgment.

■ The second phase of the demurrer goes to the evidential value and the admissibility of the opinion testimony of respondent and two witnesses that the brake wheel was caused to whirl and spin by a defective ratchet or dog or both. Does this testimony invade the province of the jury? This is an action under Section 2 of the Federal Safety Appliance Act, approved April 14, 1910 (Sec. 11, Title 45, U. S. Code Annotated). The statute provides that all cars which any common carrier may haul or use on its line "must be equipped with secure sill steps and efficient hand brakes." This section imposes an absolute and unqualified duty upon a carrier to equip and maintain hand brakes in an efficient condition. [Didinger v. Pennsylvania Railroad Co. (C. C. A.), 39 Fed. (2d) 798, and cases cited.] Negligence is immaterial. [Texas & Pacific Ry. Co. v. Rigsby, 241 U. S. 33, 43, 36 Sup. Ct. 482, 60 L. Ed. 874; Spokane & Inland

Railroad v. Campbell, 241 U. S. 497, 505, 36 Sup. Ct. 683, 60 L. Ed. 1125.] There are two recognized methods of showing the inefficiency of hand brake equipment. The first method is to establish some particular defect, the other is to give evidence of failure to function. [Didinger v. Railroad Co., supra.]

In the instant case, respondent, in his amended petition charged as negligence that the hand brake on the car in question "was so defective, insecure and inefficient that while the plaintiff was on top of the car attempting to use the said hand brake, the said hand brake suddenly and rapidly revolved and spun around and the dog and ratchet on said hand brake were so insecure and inefficient that they would not hold the hand brake in its proper position." This statement, containing some surplusage as we shall find, did no more than allege a failure to function.

In the case of Callicotte v. Chicago, R. I & P. Ry. Co., 274 Mo. 689, 204 S. W. 529, which was an action for personal injuries, the petition stated facts making a case under the Safety Appliance Act. In addition it alleged that defendant was negligent in failing to discover and repair the defects charged to exist in a car handhold. Upon appeal, defendant contended that plaintiff was bound by the theory of negligence pleaded, that he offered no substantial evidence of the negligence and therefore that the judgment should be reversed. This court, in overruling this contention, held (274 Mo. 689, 204 S. W. l. c. 530): "The allegations of negligence in the petition were the purest surplusage, and in submitting the question in the instruction respondent assumed an unnecessary burden. Whether there was evidence of negligence of the sort mentioned is a purely academic question. The absence of such evidence, despite the submission of the question, is immaterial, in view of 'the positive duty imposed by the statute upon the railroad to furnish safe appliances' in the way of handholds. [Minn. & St. L. Railroad Co. v. Gotschall, 244 U. S. 66, 37 Sup. Ct. 598, 61 L. Ed. 995.] The cases cited by appellant might be applicable, had respondent failed to recover, and had he attempted to secure a reversal on the ground that he was not required to prove negligence." This court made a like ruling in the case of Henry v. Railway Co., 332 Mo. 1072, 61 S. W. (2d) 340. Upon the reasoning of these cases it should follow that the opinion testimony of respondent and of two witnesses that the ratchet and dog were defective, even if it should be inadmissible, which we do not concede, is pure surplusage. For there is no contention that the brake was sufficient, but that Carrigan had improperly set it. But this opinion testimony is admissible upon the authority of O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55; Busch & Latta Painting Co. v. Woermann Const. Co., 310 Mo. 419, l. c. 444, 276 S. W. 614; Cropper v. Titanium Pigment Co., 47 Fed. (2d) 1038, and cases there cited.

504

We have seen that negligence has no place in a case of this nature. It should follow that the rules of the *res ipsa loquitur* doctrine which applies only to certain kinds of negligence cases, do not change what we have said about surplusage. One of the rules of the *res ipsa loquitur* doctrine is that a plaintiff who pleads specific acts of negligence must prove them without the benefit of the presumption which would arise under a plea of general negligence. That rule does not govern the allegation of respondent that the ratchet and dog were defective. In Didinger v. Railroad, supra, the United States Circuit Court of Appeals recognized a partial similarity of safety appliance cases to *res ipsa loquitur* cases but it noted the absence in the former of the element of negligence essential to the latter. That court said: "Although the existence of negligence, in the sense of a failure to use care, is immaterial, the principle of *res ipsa loquitur* applies. The failure to hold under normal operation speaks for itself."

For the reasons stated in the examination of the two phases of the demurrer, this assignment of error is ruled against appellant.

■ II. Appellant assigns as error the refusal to give Instruction C which was the only instruction requested by appellant. The instruction is as follows:

"The Court instructs the jury that if plaintiff has failed to prove to your satisfaction, by the preponderance or the greater weight of the evidence, that the hand brake on the car from which plaintiff fell was located at the east end of said car, then you are instructed that plaintiff is not entitled to recover, and your verdict should be for the defendant, and this is true without regard to any other facts or circumstances in the case."

In our opinion the trial court did not err in refusing to give that instruction. Even under the strange facts of this case, the instruction gives undue prominence to and it improperly emphasizes, as the one determining factor exclusive of all other facts in the case, the location of the hand brake. If the instruction was in form the converse of respondent's main instruction, a different question would be presented. Such a converse instruction would hypothesize the location of the hand brake at the west end of the car, the unbalancing of appellant at the east end of the car and his subsequent fall without causal connection between his fall and the brake.

■ III. The verdict of the jury was for $33,000. But the trial court reduced that amount to $20,000 in the usual way. Appellant insists that even this latter amount is grossly excessive. The principal injuries which respondent suffered were the loss of four front teeth and a skull fracture extending from the top of the head toward the right ear. X-ray plates gave evidence of the fracture. Colwell tes-

tified that his lip was cut by the teeth, and that there was an inside and outside scar on the lip. The record does not show how large or defacing the outside scar is. The four lost teeth were replaced with artificial teeth. Respondent was thirty-two years old when injured and was earning about $200 per month. He did not do any work from the time of the accident, September 12, 1928, to the date of the trial January 21, 1930. He was taken to the Frisco Hospital in St. Louis immediately after the accident and he was a patient there for twenty-three days. He then went to his home in Watertown, South Dakota and returned to the Frisco Hospital thirty days later, as he had been ordered, for examination. Thereafter he went to the hospital from time to time, but the record does not show for how long a period. Respondent testified that, from November, 1928, at least a month after he was discharged from the hospital, until the time of trial, he had what he called terrible headaches, which recurred about twice a week and lasted about eight or ten hours. He also stated that he was subject to dizzy or fainting spells and "would just keel over." On cross-examination he said that these fainting spells began in November, 1928, and that he did not have them while he was in the hospital. He added that sometimes when walking, he had a numbness in his right leg, but this condition passed away when he stood still. The frequency of the fainting spells and numbness does not appear. His eyes were bruised by the fall, but they cleared up. Mrs. Pyle, at whose house Colwell lodged prior to the accident September 12, 1928, and also from November to Christmas, 1928, testified that he had three fainting spells in her house during the latter period. During these spells, she said, his face became blue and then it flushed, and there was froth on his mouth.

Dr. Deppe, a specialist in nervous and mental diseases, who examined Colwell, testified that he had a damage to the right side of the brain and also that part of the brain which controls the equilibrium and balance. He first stated that he did not know whether this condition was permanent. But later he answered that the possibilities are the damage "is going to stay there. It may get some better, but won't get any worse."

Dr. W. H. Hoge, who examined respondent with reference to his nervous condition in December, 1928, and a few days before the trial in January, 1930, found a depressed place in the skull "about two inches in length backward and about an inch wide in a cross-section at the widest point." Dr. Hoge described certain tests which he made upon Colwell, and from these he judged that Colwell was suffering from a head injury, reasonably attributable to the fall. He also stated that this brain injury could be permanent, and if not permanent it would last a long time. When asked whether the conditions which he discovered could cause epilepsy, he answered that "such an injury does cause epilepsy. One could not say that in a majority of cases epilepsy is caused."

Prior decisions are merely advisory and are not controlling on the question of excessive damages in personal injury cases. [Byars v. St. Louis Public Service Co., 334 Mo. 278, 66 S. W. (2d) 894.] While a standard of uniformity should be kept in mind, whenever the question of an excessive judgment is raised (Radler v. St. Louis-San Francisco Ry. Co., 330 Mo. 968, 51 S. W. (2d) 1011), it is yet true always that each case presents its own problem. Aside from the testimony which we have narrated in substance, there was before the jury Mrs. Pyle's bedside story of Colwell in the hospital. She reached the hospital a few hours after the accident. "His head had a bandage around it and he was covered with blood and it looked as if every tooth was out of his head." He lost only four teeth. Mrs. Pyle with whom Colwell roomed, had been called to the hospital to tell where his family resided. But she stayed all day and returned the next day, as "I didn't want to leave him as I figured someone should be there with him. He had no relatives there." And when she was about to leave the first day she observed that "his clothes were full of blood, and it was a very grewsome sight, so I just took them with me." This and other testimony in which Mrs. Pyle noted Colwell's suffering, bleeding, breathing, unconsciousness, during his first two days in hospital was not so informing as it was harrowing beyond comparison with the testimony of the physicians. In our opinion, it did much to move the jury to return a verdict for $33,000. We believe that the trial court did not cure the harm done by ordering a *remittitur* of $13,000, and entering judgment for $20,000. We base this conclusion on the testimony touching Colwell's injuries and their consequences, and heretofore epitomized, unmoved beyond what we have said by that part of Mrs. Pyle's testimony which we have called harrowing. We believe that a judgment for $12,000 would be more in accord with the substantive facts and the law.

If therefore, respondent, within ten days, will enter a *remittitur* of $8,000 upon the judgment of $20,000, the judgment of the trial court will be affirmed in the sum of $12,000, as of the date of the judgment in the circuit court. Otherwise the judgment for $20,000 will be reversed and the cause remanded. *Cooley* and *Westhues, CC.*, concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All the judges concur.