WILLIAM GIESEKING v. LITCHFIELD & MADISON RAILWAY COMPANY, Appellant.—94 S. W. (2d) 375.

Division One, April 23, 1936.

2

*T. M. Pierce, Samuel H. Liberman* and *Burton K. Philips* for appellant.

*Louis E. Miller, William C. McLaughlin* and *Robert R. Adams* for respondent.

4.

HYDE, C.—This is an action for damages for personal injuries under the Federal Employers' Liability Act (45 U. S. C. A. 51-59) for a violation of the Federal Safety Appliance Act (45 U. S. C. A. 11). Failure to have an efficient handbrake on a car in use by defendant was the alleged violation of the Safety Appliance Act. Plaintiff's evidence showed that the handbrake did not stop the car, which he rode in making a drop switch, although he turned the wheel as far as he could turn it; that the brake staff was loose, shaky and wobbly; and that he was injured when this car collided with standing cars. Plaintiff had a verdict for $44,840.40. The trial court ordered a *remittitur* of. $29,000 which was made and judgment was entered for $15,840.40. From this judgment defendant appealed.

Defendant contends that its demurrer to the evidence at the close of the case should have been sustained, because plaintiff was injured in the State of Illinois. Defendant says that plaintiff's only right to compensation for his injuries was under the compulsory Illinois Workmen's Compensation Act; and that plaintiff cannot now claim under the Federal law because he did accept benefits of $159.60, awarded under the State act. Plaintiff's instructions required this amount to be deducted in the verdict. from the total amount assessed by the jury as damages for plaintiff's injuries on the theory that this was authorized under Section 55, U. S. C. A., Title 45. Defendant's argument. is also based upon its further contention that plaintiff was not engaged in the work of interstate transportation at the time he was injured. Although defendant does not concede that, if he was so engaged, the Federal Employers' Liability Act would apply notwithstanding the acceptance of benefits under the State Compensation Act, our view is that this is the rule because the Federal Act is exclusive in the field of interstate transportation. [See Erie Railway Co. v. Winfield, 244 U. S. 170, 37 Sup. Ct. 556, 61 L. Ed. 1057.] Moreover, the Illinois Act expressly excludes from its provisions employees whose injuries are covered by exclusive laws of the United States. [Chap. 48, sec. 142, Smith-Hurd Ill. Rev. Stat. 1931.] Defendant cites certain Admiralty cases holding that retaining State compensation payments waives the benefit of the Federal law. However, defendant does not contend that there is any provision in Admiralty law which is comparable to Section 55, U. S. C. A., Title 45. At least, the United States Supreme Court has never yet ruled that acceptance of benefits under a State compensation law bars an action under the Federal Employers' Liability Act if an employee was injured by negligence of

his employer while engaged in interstate work. We, therefore, hold that there was no error in overruling defendant's demurrer to the evidence.

Defendant further contends that even if the Federal law does apply because there is evidence which would warrant a finding that plaintiff was engaged in interstate transportation, still the judgment herein cannot stand because plaintiff's instruction authorizing a verdict in his favor did not require the jury to so find. This contention is supported by the recent decision of this court in Kimmie v. Terminal Railroad Assn., 337 Mo. 1245, 88 S. W. (2d) 884. Here, as in that case, plaintiff pleaded and attempted to prove that his employment was interstate. If his evidence was sufficient to so show, and was believed by the jury, he "could recover only under the Federal Employers' Liability Act because under such circumstances said act would be exclusive." Therefore, as said in the Kimmie case, "it was the duty of plaintiff to request and the court to give an instruction authorizing a recovery under said act, if there was evidence tending to show that both defendant and plaintiff at the time were so engaged, and plaintiff's injury was caused by defendant's failure to comply with the Safety Appliance Act." The failure to require this finding was, under the pleading and evidence herein, reversible error. [See also Davis v. C. & E. I. Railroad Co., 338 Mo. 1248, 94 S. W. (2d) 370.]

It is true, as also said in the Kimmie case, that "if the averments with reference to interstate commerce and negligence had been eliminated, recovery would have been authorized under the State law for a violation of the Safety Appliance Act." However, the trouble in this case with attempting to recover upon a common-law theory, under State law, is that no such right is given under the State law applicable because, under the circumstances shown here, that right has been abrogated in Illinois by its Workmen's Compensation Act. In other words, plaintiff here cannot maintain any action unless he comes within some Federal law, and there is no way plaintiff can recover under Federal law except to bring himself within the Federal Employers' Liability Act. [Gilvary v. Cuyahoga Valley Railroad Co., 292 U. S. 57, 54 Sup. Ct. 573, 78 L. Ed. 1123.] Violation of any requirement of the various Federal Safety Appliance Acts is negligence *per se*, which gives an employee injured thereby the right to recover under the Federal Employers' Liability Act, if he was engaged in interstate work at the time of his injury. [San Antonio & A. P. Railroad Co. v. Wagner, 241 U. S. 476, 36 Sup. Ct. 626, 60 L. Ed. 1110; Chicago G. W. Railroad Co. v. Schendel, 267 U. S. 287, 45 Sup. Ct. 303, 69 L. Ed. 614, and cases cited; McAllister v. St. L. M. B. T. Railroad Co., 324 Mo. 1005, 25 S. W. (2d) 791; Brady v. Wabash Railroad Co., 329 Mo. 1123, 49 S. W. (2d) 24, certiorari denied 287 U. S. 619, 53 Sup. Ct. 20, 77 L. Ed. 538; Alcorn v. Missouri Pacific Railroad Co., 333 Mo. 828, 63 S. W. (2d) 55.] It is likewise

negligence *per se*, which gives an employee (or in some cases others, see Fairport, P. & E. Railroad Co. v. Meredith, 292 U. S. 589, 54 Sup. Ct. 826, 78 L. Ed. 1446) the right to recover under the principles of the common law as applied in the State in which the injury occurred, if he was not engaged in interstate work at the time of his injury. [Moore v. C. & O. Railroad Co., 291 U. S. 205, 54 Sup. Ct. 402, 78 L. Ed. 755; Texas & P. Railroad Co. v. Rigsby, 241 U. S. 33, 36 Sup. Ct. 482, 60 L. Ed. 874; Minneapolis, St. P. & Ste. M. Railroad Co. v. Popplar, 237 U. S. 369, 35 Sup. Ct. 609, 59 L. Ed. 1000; Tipton v. A., T. & S. F. Railroad Co., 78 Fed. (2d) 450; L. & N. Railroad Co. v. Nichols (Tenn.), 80 S. W. (2d) 656.] But where the employee is not entitled to bring a common-law action, because such a common-law action has been superseded by the Workmen's Compensation Law of his state, then such employee must prove himself to have been injured while engaged in interstate work, in order to be within the scope of the Federal Employers' Liability Act, or he has no right, other than the right his State Compensation Act gives him, no matter what violation of the Federal Safety Appliance Act caused his injury.

■ Therefore, if there is not evidence herein sufficient to make a jury issue on the question of interstate work, then this case should be reversed; but if there is sufficient evidence that plaintiff was engaged in interstate work to make such an issue of fact for the jury, then it should be reversed and remanded because plaintiff's instruction authorized a verdict without requiring a finding that plaintiff's work, when he was injured, was interstate. On that issue, there was evidence tending to show the facts hereinafter stated. Plaintiff, a resident of Edwardsville, Illinois, went to work there, about two P. M. on July 16, 1931. He left defendant's yards at Edwardsville, with a switching crew, going to Madison, Illinois, where they picked up a train and took it to Mount Olive and Benld, also in Illinois. From these points, they returned to Edwardsville, which they reached about eight P. M. They brought with them an empty Shell tank car, which they had picked up at Madison and which was destined for the Illinois Terminal track "at the south end of the Edwardsville yard." When they arrived at Edwardsville, they were given further instructions, which required them to take certain cars from the plant of the United States Radiator Corporation and to make delivery of certain other cars to that plant.

Plaintiff testified, concerning their duties, as follows:

"After we got to Edwardsville we received the switch list and were told we had to do up the switching. . . . Pull the radiator, take out whatever cars was in there, respot it, do all the delivering in the yards. . . . Taking out all the empty cars or loads, whatever was in there, whatever was to be shipped—or empty cars to go out had to come out. . . . Whatever cars the United States Radiator

wanted for reloading, or whatever loads they had to be unloaded had to be respotted back in there, to be reloaded or loaded, whatever was called for. . . . We was to respot it again, whatever went in that Radiator that night.''

The first movement the crew made was to take eight or ten cars out of the Radiator plant. Then they switched out an empty Southern Railway box car and made a drop switch of it and the Shell tank car at the Illinois Terminal track while on their way to a track beyond. To make this drop switch, the cars were uncoupled from the engine while moving away from the Radiator plant, and, after the engine passed the Illinois Terminal track, the switch was thrown so that these two uncoupled cars, which were to be slowed down by plaintiff, by use of the handbrake, would go on that switch track. Plaintiff was injured when these cars ran against other cars on the Illinois Terminal track. Evidently the Shell tank car had remained coupled to the engine throughout all the other switching operations. It had been brought from Madison, back through Edwardsville, on the way north that afternoon and was returned there with the engine that night. Defendant's general manager said, as to the destination of the Southern box car, "it was going home to the Southern Railway Company at East St. Louis.''

Defendant's switch foreman said that the presence of the Shell tank car did not interfere with any other operations they were going to make, but he was not asked if the same thing was true as to the Southern box car. He also said that, at the time he dropped them, he "wasn't ready to go to the United States Radiator plant.'' As to how these cars happened to be run onto the Illinois Terminal track by a drop switch on that particular movement, he further testified as follows:

"Q. State whether or not, Mr. Bishop, there was any purpose in delivering this tank car to the Illinois Terminal track other than that of returning it to its destination. A. Well, it was listed to that track and I had a chance to get rid of it and I delivered it at that time. . . . Q. Had you been down in the south end of those yards that night before this occurrence had happened? A. No, sir. . . . Q. Now, did you remain on the pilot of the engine throughout the movement, or did you leave it after the engine came to a stop? A. I coupled the engine onto a cut of cars on the new track. . . . Q. About how many cars did you have for delivery into the United States Radiator Plant that night, if you know? A. I don't recall how many cars I put in there. Q. You had some to deliver in there, though, didn't you? A. Yes. Q. You had the tracks of that plant to pull, too, didn't you? A. I had already pulled them. Q. Then you were getting ready to make a delivery into the plant, is that correct? A. Yes.''

The switchman, who threw the switch for the drop switch at the Illinois Terminal track stated the further purpose of the movement thus:

"Q. What did you do after you had thrown the switch? (For the drop). A. Well, sir, I went down in what we call the new track. Q. Where is that with respect to the main track? A. That is east there. South of where the long track switch is, to the east of the Illinois Terminal wye. Q. Then what happened? A. We had a car to get out of there. It was first out, I am pretty sure. That would be the first car in the track. Bring that car out of there and we were going in what they call the long track."

Plaintiff further testified:

"Q. After you had made the delivery of these two cars did you have any further work to be done respecting the Radiator plant? A. Yes, sir. Q. What? A. We had to respot the Radiator. Q. What do you mean by respotting the Radiator? A. Whatever cars they had; if there was any loads in the loaded cars for the Radiator, or whatever empties they wanted for the next day's work, had to be brought back down there. . . . Q. State what was necessary to be done before you could respot the Radiator plant; in other words, what movement or movements of cars did you have to make before you could respot the Radiator? A. We had to pull the cars out of there. If there was any loads or empties they had to be taken out of there before it could be respotted. Q. Are you able to say whether or not this movement south on this switch track—in other words, are you able to state whether or not it was necessary to make that movement before you could get into the Radiator track? A. Yes, sir. Q. Why was it you had to make this movement of these two cars south before you could get in and respot the Radiator track? A. In order to get them out of the way and get room so we could use the tracks again to get our cars together to go back and respot. Q. As long as these two cars, namely, the Southern box car and the Shell Petroleum car, as long as they were on the tracks in that place could you complete your switching operations and respot the Radiator track while they were there? A. Not very good; no, sir. Q. In other words, then, was it necessary to first drop these two cars before you could respot the Radiator? A. Yes."

Defendant's records for July 11th showed that the Shell tank car was delivered at the Illinois Terminal about nine fifteen P. M., and no other car was listed as delivered there that night. The inference would, therefore, seem to be justified that the Southern box car was only left there temporarily. These records also showed that four cars were moved from one part of the Radiator plant to another part, but they do not show whether they moved that night or earlier in the day. One of these was loaded with radiators and boilers for Portland, Oregon. Whether it was one of the cars pulled out of the plant that

night is not definitely stated in these records but they do not show that it went out the next day as was stated in the case the others noted as reset or brought in for loading that night. These records do specifically show that on the "night of July 16th" four cars were "set in empty" to be loaded. They do further show that "Car 170120—B & O—was an inbound carload of heaters originating at West Newton, Pa., on the B & O Railroad, moving on West Newton, Pa., to Edwardsville Waybill 42 July 13th, 1931, containing heaters for the U. S. Radiator Corporation"; and that "this car was set into the Radiator plant on the night of July 16th on Track 2, Door 5 for unloading, which was completed on July 17th, car being sent back to connecting line empty at Madison, Illinois."

We think that it would be reasonable for the jury to infer from these facts shown that the Southern box car was in the way of the cars to be moved in to the Radiator plant; that it was moved out for that reason; that it was dropped with the Shell tank car on the Illinois Terminal track to get it out of the way temporarily; and that the engine was then engaged in a movement toward and for the purpose of picking up the cars, which were to be delivered into Radiator plant, one of which was clearly an interstate car. If an empty car is necessarily moved in order to place an interstate car at its final destination, the primary purpose of the movement is interstate. [Pennsylvania Co. v. Donat, 239 U. S. 50, 36 Sup. Ct. 4, 60 L. Ed. 139.] Employment in interstate transportation "begins when the workman, on a carrier's premises, makes a forward move to serve in that traffic," and if there is any substantial evidence to show that plaintiff's crew were so moving, then "whether or not the plaintiff was engaged in interstate commerce at the time of the accident was a question of fact to be determined by the jury." [Howard v. M. & O. Railroad Co., 335 Mo. 295, 73 S. W. (2d) 272, and cases cited.] If the engine was moving toward an interstate car for the purpose of completing its delivery to its final destination, the interstate character of the movement would not be changed by the fact that, while so moving to begin this interstate work (and without stopping), the crew took the opportunity to make a drop switch to place, at its destination, an intrastate car which it had been hauling around for several hours. [New York C. & H. R. Railroad Co. v. Carr, 238 U. S. 260, 35 Sup. Ct. 780, 59 L. Ed. 1298; Rogers v. M. & O. Railroad Co., 337 Mo. 140, 85 S. W. (2d) 581; 2 Roberts Federal Liability of Carriers, 1373, sec. 727, 1375, sec. 728.] Especially would this be true if by the same operation a car was placed out of the way of the interstate delivery, when it was necessary to move that car before such an interstate movement could be completed. If these inferences as to the purpose of the movement are not correct, defendant should be able to produce evidence to the contrary. At least we think that sufficient basis has been shown, for reasonable inferences which tend to show that the movement was in-

terstate, as to require another trial at which all matters relevant to this issue may be fully developed.

The judgment is reversed and the cause remanded. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM.—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.