WILLIAM GIESEKING v. LITCHFIELD & MADISON RAILWAY COMPANY,
Appellant.—127 S. W. (2d) 700.

Division One, May 2, 1939.*

*NOTE: Opinion filed at September Term, 1938, March 8, 1938; motion
for rehearing filed; motion overruled April 1, 1939; motion to transfer to
Court en Banc filed; motion overruled at May Term, 1939, May 2, 1939.

*Pierce, Liberman & Menzi* for appellant.

674

*Louis E. Miller* and *Robert R. Adams* for respondent.

HYDE, C.—This is an action under the Federal Employers' Liability Act (45 U. S. C. A., Secs. 51-59) for a violation of the Federal Safety Appliance Act (45 U. S. C. A., Sec. 11) in which judgment was reversed and remanded on former appeal because of failure to submit the issue of whether plaintiff was engaged in interstate transporation at the time of his injury. [Gieseking v. L. & M. Railroad Co., 339 Mo. 1, 94 S. W. (2d) 375.] Plaintiff was injured in the State of Illinois. The last trial resulted in a verdict for $44,840.40 (as before) for plaintiff. A *remittitur* of $20,000 was ordered and made. This appeal is from the judgment for $24,840.40.

Defendant again contends that its demurrer to the evidence should have been sustained both because of insufficient evidence to show that plaintiff's work was interstate transportation, and because he accepted benefits under the Illinois Workmen's Compensation Act. We ruled against defendant on this latter question, in the former opinion, because "the Federal Act is exclusive in the field of interstate transportation;" and because "the Illinois Act expressly excludes from its provisions employees whose injuries are covered by exclusive laws of the United States." On these grounds, it has been held that "awards under state compensation laws to

employees, of common carriers by railroad, killed or injured while engaged in interstate commerce, are void." [2 Roberts Federal Liabilities of Carriers, sec. 796, p. 1356, and cases cited.] Defendant, however, contends that even if the Illinois Workmen's Compensation Act is inapplicable, nevertheless acceptance of benefits thereunder amounted to an accord and satisfaction which destroyed the right of action. They cite Brassel v. Electric Welding Co., 239 N. Y. 78, 145 N. E. 745. In that case, the plaintiff was denied recovery in the State court on a common-law action for damages sustained on navigable waters, because he had accepted payment of an award of compensation. We note that the plaintiff there, after his injury, "made application to the State Industrial Board for an award of compensation under the Workmen's Compensation Act;" that "the Board made the desired award;" and that "the defendant paid in full."

In this case, plaintiff made no application, defendant gave the notice of his injuries to Illinois Industrial Commission, voluntarily made all payments direct to him, and reported these to the Commission. The final report contained the following:

"Was there an arbitration? No. Was there a review? No. Was there a settlement contract? No. Was there a lump sum settlement? No."

The report also stated that the payments were made for a certain number of weeks "for temporary total disability." While this report also contained a final receipt, it was stated therein that plaintiff received "the total sum of One Hundred Fifty-Nine dollars and Sixty cents ($159.60), in full settlement of compensation under the provisions of the Illinois Workmen's Compensation Act, for injuries received by me, William H. Gieseking on or about the 16th day of July, 1931, while in the employ of Litchfield & Madison Railway Company, subject to review by the Industrial Commission." It would seem unreasonable to construe this transaction as a full settlement and release for permanent injuries sustained by plaintiff while engaged in interstate transportation. The United States Circuit Court of Appeals (Second Circuit) has recently held that a similar agreement for compensation was not an accord and satisfaction and did not bar an action under the Federal Act. [Hoffman v. N. Y., N. H. & H. Railroad Co., 74 Fed. (2d), 227, certiorari denied 294 U. S. 715, 55 Sup. Ct. 513, 79 L. Ed. 1248.] We will follow this decision and adhere to our former ruling.

▮ Of course, plaintiff should not be entitled to keep these payments, because if he was engaged in interstate transportation, when injured, all State compensation proceedings would be void. [New York Central Railroad Co. v. Winfield, 244 U. S. 147, 37 Sup. Ct. 546, 61 L. Ed. 1045; Erie Railroad Co. v. Winfield, 244 U. S. 170, 37 Sup. Ct. 556, 61 L. Ed. 1057.] Plaintiff's instructions

recognized this and required the amount which has been so received to be deducted in the verdict from the total amount assessed by the jury as damages for plaintiff's injuries on the theory that this was authorized under Sections 55, U. S. C. A. Title 45. Defendant contends that Section 55 has no application to payments made under a Workmen's Compensation Act. Whether that is true or not is immaterial, because we consider that amounts due from plaintiff to defendant (payments he was not entitled to keep), could properly be so credited (as under the rule stated in Section 55) regardless of the applicability of Section 55 to this situation. [See Larscy v. Hogan & Sons, 239 N. Y. 298, 146 N. E. 430.] What we have said disposes also of defendant's assignment based on the full faith and credit clause of the United States Constitution (see Hoffman v. N. Y., N. H. & H. Railroad Co., supra); and also its assignments on refusal of instructions submitting release and estoppel to the jury. For effect of an award on a claim filed by an employee, on such a cause of action see State ex rel. Wors v. Hostetter, 343 Mo. 945, 124 S. W. (2d) 1072.

Upon the question of interstate work, reference is made to our opinion (94 S. W. (2d) l. c. 378-379) for a full statement of the crews' preliminary work and testimony as to the movement upon which plaintiff was injured. In this trial, defendant introduced the transcript of the testimony of switch foreman Bishop therein quoted. Plaintiff and the other switchman Murphy again testified. Their evidence was substantially the same as that set out in our former opinion, except that some additional facts, hereinafter mentioned, were brought out in their testimony. The conductor's switch list for the U. S. Radiator plant, some further information from defendant's records about the cars involved, and plats of the Edwardsville yards make the entire situation clearer than did the former record.

Defendant's main track ran north and south through Edwardsville. The Radiator plant was located on the east side of the main track at the north end of the Edwardsville yards. It had two tracks (324 and 670 feet in length); the east track ran alongside a platform and the west track was next to the warehouse. South of the Radiator plant on the west side of the main track, and parallel to it, was track 1, 924 feet long, with switches at both ends connecting it with the main track. Just south of the south switch of the track 1 was the switch of the Illinois Terminal track which curved off from the main track to the southwest. Just south of the Illinois Terminal switch, two more of defendant's switch tracks led off from and paralleled its main line on each side and ran back into it farther south. The one on the east side of the main track (1894 feet long) was called the new track; and the one on the west side (2157 feet long) was called long track.

When the switching crew returned in the evening from the north

to Edwardsville, they had attached to their engine their caboose and the tank car RPX743 which was to be delivered to the Illinois Terminal track. The first thing they did was to put away their caboose, while the conductor got the switch list. This switch list directed them to move ten cars then at the Radiator plant, and to bring into the plant five cars then on the new and long tracks. The five cars to be brought into the plant were four empty box cars, to be placed for loading, and one loaded car B & O 170120 "from West Newton, Pennsylvania, containing radiators and radiator parts, consigned to the United States Radiator Corporation, Edwardsville, Illinois." This car was to be placed on Radiator track 2, at door 5, for unloading. (Apparently track 2 was the warehouse track.) Of the ten cars at the plant, four were to be reset there. Two of these were to be loaded with sand (they were partially loaded) and were to be reset at the Radiator sand chute. Another partially loaded car was to be reset from new Radiator track to Radiator track 2 at door 3, to complete loading. The fourth was an empty car to be reset on Radiator track 2, no door being specified on the switch list.

The other six cars, which the switch list directed the crew to move from the plant, were, as follows:

Southern 254054, a box car which had been unloaded at the plant, to be taken to Madison and there delivered at the Southern Railway connection.

NKP20380, a car loaded with radiators, to be taken to Madison, but the record does not show its ultimate destination or to what railroad it was to be delivered there.

NKP20396, a car loaded with radiators for Kansas City, Missouri, to be taken to Madison.

NKP20140, a car loaded with radiators for Cookeville, Tenn., to be taken to Madison.

NKP18601, a car loaded with radiators for Pittsburgh, Pa., to be taken to Madison.

NKP19704, a car loaded with radiators for Milwaukee, Wisconsin, to be taken to Litchfield.

The first thing the crew did to comply with this switch list was to pull all ten cars out of the radiator plant down the main line past the south switch of track 1 and then push them north into track 1. The tank car remained next to the engine on this movement, and there were two or three cars between the tank car and the Southern box car. Then the Southern car was uncoupled from the cars north of it on track 1 and pulled out on the main line with the cars between it and the tank car. The Southern car was then uncoupled from these cars and left on the main line while these cars were pushed back into track 1 and uncoupled from the tank car. Then the Southern car was coupled to the tank car, and the engine backed south (in the direction of the new and long tracks) with these two cars to

make a drop switch of them at the Illinois Terminal switch. The tank car was uncoupled from the engine before it reached this switch, so that the engine continued south on the main line until it cleared the Terminal switch, which was then thrown so that the tank car and the Southern car ran into the Terminal track. Plaintiff's evidence was that he was injured by a collision with other cars standing on the Terminal track because the hand brake of the tank car, on which he rode, would not stop the cars.

In addition to substantially the same testimony as quoted in our former opinion, plaintiff further testified, as follows:

"We had to get them cars out of the Radiator and make them deliveries in order to get back down there to respot the Radiator. Q. When you speak of 'them cars', what cars do you refer to? A. The Southern box car and the Shell tank car and also these others we pulled out. . . . The next thing we had to do was switch out our cars for the respotting of the Radiator. . . . We had to switch them out of the yard and get them together in one bunch and then bring them down the Radiator and spot them. . . . Q. Was there any room back up at the Radiator plant to have switched this tank car and this Southern box car out of the way—in other words, could it have been handled up there? A. No, sir. . . . After they were delivered there was nothing more in the way but switch out our cars for the Radiator. . . . Q. I am talking about only the two cars—those two cars, the Shell tank car and the Southern box car—I asked you to state what explanation, if any, Mr. Bishop gave for that move at that time? A. He told us we could make the drop of them two cars, to get them out of our way, to make room to get our cars out, to go back again to respot the Radiator. Q. You used the term 'make room.' I will ask you what were the facilities—in other words, how much track did you have down there to switch out; give us some idea, if you will, please? A. There is very little room there. We got those cars out of the Radiator into track 1 and filled it up and there was no other room for them. We had to drop them cars to get room. Q. I will ask you if you had any other place to put them other than the wye track at that time? A. No, sir, we didn't."

Switchman Murphy also testified, concerning the purpose of the drop switch, as follows:

"Q. Was any explanation given at the time of the dropping of these two cars that you referred to? A. Well, the only thing is this: We had to get rid of the cars so we could do our work. We had to deliver the two cars we had, get rid of them. Q. What work did you have to do in order to get rid of these cars? A. We had to respot the Radiator. . . . We had to get rid of the cars before we could respot. . . . It was a temporary movement of the box car, but the tank was a permanent movement. . . . Q.

Now, then, later on, after this accident to Mr. Gieseking, I will ask you if you made deliveries of all those cars to the Radiator plant? A. Yes, sir.''

Plaintiff's evidence also showed that the Southern car could not have been left on the main line because there was a train about due to come through on the main line; that to attempt to ''respot the Radiator'' with the Southern box car ahead of the engine would shut off the headlight (it was night time) so that they could not see; that ''track 1 was filled up'' (at the south) ; and that ''the new track and the long track were both full'' (at the north end). Plaintiff explained that the cars ''pulled from the Radiator track (to be reset) would be taken back, after we got the radiator cars (the five new cars to go in) all lined up, pulled them alongside of track 1, and push these (the cars going to Madison and Litchfield) out of track 1 into the long or new track, and push these others (new cars going in and old cars going back) down in the radiator and spot them.''

The decisive question here is whether this crew (as contended by defendant) was engaged in a series of separate independent successive switching movements, some of which were in interstate transportation and some of which were solely intrastate; (See Illinois C. Railroad Co. v. Behrens, 233 U. S. 473, 34 Sup. Ct. 646, 58 L. Ed. 1051; Erie Railroad Co. v. Welsh, 242 U. S. 303, 37 Sup. Ct. 116, 61 L. Ed. 319; McNatt v. Wabash Ry. Co., 335 Mo. 999, 74 S. W. (2d) 625; Siegel v. M.-K.-T. Ry. Co. 342 Mo. 120, 119 S. W. (2d) 376), or whether (as contended by plaintiff) each movement was one step in a series of related acts all done to accomplish the transportation of interstate freight. [See Pennsylvania Co. v. Donat, 239 U. S. 50, 36 Sup. Ct. 4, 60 L. Ed. 139; N. Y. C. & H. Railroad Co. v. Carr, 238 U. S. 260, 35 Sup. Ct. 780, 59 L. Ed. 1298; Rogers v. M. & O. Railroad Co., 337 Mo. 140, 85 S. W. (2d) 581; Howard v. M. & O. Railroad Co., 335 Mo. 295, 73 S. W. (2d) 272; McNatt v. Wabash Ry. Co., 341 Mo. 516, 108 S. W. (2d) 33; Hoffman v. N. Y., N. H. & H. Railroad Co., 74 Fed. (2d) 227.] Our view is that there was substantial evidence in this record to establish the latter proposition.

It now appears (as it did not before) that the crew in all these movements was working under a Radiator plant switch list which required all the Radiator work to be completed before doing anything else. It also now appears (as it did not before) that four of the cars pulled out of that plant were *interstate* cars. It also appears that it was the duty of the crew, after it got the cars from the Radiator on to track 1, both to deliver an *interstate* car to the plant (from either the new track or long track), and to further advance the progress of the *interstate* cars pulled from the plant by placing them on either the new track or the long track. It was intended that

other crews would pick them up there and advance them again on their respective *interstate* journeys by delivering them to connecting carriers at Litchfield and Madison. Otherwise stated, the Radiator ·switch list directed the crew to pull four *interstate* and six intrastate cars from the plant, deliver to the plant an *interstate* car and four intrastate cars together with four of the six intrastate cars, pulled out, and place the four *interstate* cars and two of the six intrastate cars, pulled ·out, on the tracks where other crews would expect to find them when ordered to move them to the next connecting carriers on their interstate trips. Thus viewing the directions of the switch list, the jury could reasonably find that all ten cars had to be pulled from the plant before the *interstate* car could be delivered there; that track one was the only available place to put these cars while the string of cars, to go into the plant, was being made up; that it was necessary to get the Southern box car (which was to go to Madison with three of the *interstate* cars, pulled from the plant) out of the string on track 1 before the string, to go into the plant, could be made up; that there was no other place to put it, where it would be out of the way of movements necessary to make up the string, to go into the plant, and also the movements necessary to properly place the out-going *interstate* cars, except on the Illinois Terminal track; that, in putting it there, it was convenient to put the tank car in ahead of it so that it would be finally delivered to its destination and be out of the way of all. further movements; that this also put the Southern box car where it could be conveniently reached when, after making up the string, to go into the plant, it could be coupled onto the *interstate* cars going to Madison and placed on either the new track or the long track with them; and that the movement which placed them there by a drop switch was a movement toward the incoming *interstate* car, to take it from either the long track or the new track (it was on one or the other and these tracks were on each side of the main track where the engine then was), and to put it in the string being made up to go into the plant. In short, the jury could reasonably find that Southern box car and the tank car, when on track 1, interfered with both *interstate* movements that the crew was attempting to make.

These findings would justify the conclusion (stated in our former opinion) that ''the engine (while making the drop switch) was moving toward an interstate car for the purpose of completing its delivery to its final destination,'' and also that ''by the same operation a car was placed out of the way of an interstate delivery, when it was necessary to move that car before such an interstate movement could be completed.'' These findings would also justify the further conclusions that the· work then under way, directed by the Radiator switch list, was not only delivery of an incoming interstate car into the plant, but was also moving outgoing interstate

cars on the first part of their journey from the plant to their interstate destinations; and that the switching of the Southern car at the time plaintiff was injured was for the purpose of furthering both movements. In other words, the dominant purpose of all movements pursuant to the directions of the Radiator switch list was interstate transportation. We, therefore, hold that plaintiff made a jury case on the issue of interstate transportation and that defendant's demurrer to the evidence was properly overruled.

Defendant also assigns as error, admission of incompetent evidence, modification of its Instruction 4, and giving plaintiff's Instructions 1 and 2. The testimony complained about consisted of statements concerning what would be done next, on the ground that these were succeeding separate independent tasks which had no relation to the movement in which plaintiff was injured. Our construction of all the Radiator plant work as part of one entire intermixed and interrelated transaction disposes of this assignment. It also disposes of the claim of error in the modification of defendant's Instruction 4, which made it require a finding that the movement in which plaintiff was injured "was *solely* for the purpose of delivering the Shell tank car onto the Illinois Terminal tracks," before the jury could find that plaintiff was not injured in interstate work. Defendant cited Wise v. Lehigh Valley Railroad Co., 43 Fed. (2d) 692, where two switching movements were directed in the same order and in which it was held that "one transaction was no more dominant than the other, nor were these movements interdependent or intermixed" but "were quite separate." Judge HAND, who wrote the Wise opinion, said in the Hoffman case (74 Fed. (2d) l. c. 231) that "in the Wise case we held that there was no sufficient proof that any car was designated for interstate commerce." In the Hoffman case, as here, certain cars including a hand car were to be moved out of a building track, so that interstate cars could be placed there. The court held "that the removal of the hand car (in which removal plaintiff was injured) from track 2 was 'for the purpose of furthering the later work' of interstate commerce." We hold that a similar situation was herein involved, and that modification requiring a finding that the Terminal track movement was "quite separate" was proper.

As to Instruction 1, it is contended that it directed a verdict for the plaintiff if the jury found the facts hypothesized by the instruction and the additional fact of interstate commerce and ignored the affirmative defenses of release, estoppel, accord and satisfaction. Our ruling on the demurrer to the evidence was that it would be unreasonable to construe what was done under the Illinois Workmen's Compensation Act as a full settlement and release. We, therefore, hold that there was no issue of release, estoppel, or accord and satisfaction to submit to the jury. Defendant also con-

tends that the instruction by permitting recovery upon a finding of injury "caused by an inefficient and inoperative condition of said hand brake" departed from the grounds pleaded ("a loose, worn and wabbly condition") and gave the jury a roving commission. Plaintiff's petition, however, alleged not only "a loose, wabbly condition," but also a violation of the laws of the United States in failing to furnish efficient hand brakes, and that plaintiff attempted to operate the hand brake in the usual and customary manner but that this did not prevent a collision because it failed to stop the cars. Plaintiff's Instruction 1 required a finding of all these things which may have included some surplusage but in effect amounted to a finding of failure of the brake to function. [Colwell v. St. L.-S. F. Ry. Co., 335 Mo. 494, 73 S. W. (2d) 222.] Plaintiff's evidence was sufficient to show that a properly working hand brake would have stopped the cars in ample time to avoid a collision. It has been uniformly held that it is not necessary for plaintiff to show a precise defect to make a case under the Federal Safety Appliance Act (U. S. C. A., sec. 11), but only that a hand brake, properly set in the normal and usual manner, failed to work. [Detroit, T. & I. Ry. Co. v. Hahn, 47 Fed. (2d) 59; Didinger v. Penna. Railroad Co., 39 Fed. (2d) 798; Minneapolis & St. Louis Railroad Co. v. Gotschall, 244 U. S. 66, 37 Sup. Ct. 598, 61 L. Ed. 995; Anderson v. C. & O. Railroad Co. (Ill.), 186 N. E. 185, certiorari denied 290 U. S. 675, 54 Sup. Ct. 93, 78 L. Ed. 583; Henry v. C., C. C. & St. L. Railroad Co., 332 Mo. 1072, 61 S. W. (2d) 340, certiorari denied 290 U. S. 627, 54 Sup. Ct. 70, 78 L. Ed. 546.] We hold that these alleged defects in Instruction 1 did not make it prejudicially erroneous.

 Defendant contends as to Instruction 2 (hypothesizing facts necessary to constitute interstate work) that it was broader than the pleadings, authorized findings which were inconsistent and contradictory and which were not supported by evidence. Defendant says the instruction "permitted the jury to find that the crew, at the time plaintiff was injured, was engaged in a movement towards an interstate car and in furtherance of the delivery of the interstate car to its ultimate destination when the pleaded movement was solely that the crew was engaged in a switching operation involving the movement of certain cars onto the Illinois Terminal connection."

Although plaintiff's petition stated that plaintiff was injured in this particular movement, it also alleged "at the times mentioned in the petition was employed by the defendant in interstate commerce and at the time of his injuries he was engaged in work in furtherance of interstate commerce." We hold that the petition's statements were broad enough to authorize this submission. The sufficiency of the evidence to support the required findings essential to show the interstate character of the work has been discussed and ruled against defendant in ruling the demurrer to the evidence. We overrule the objections urged against Instruction 2.

 Defendant's final assignment is that the verdict, even after *remittitur*, is still excessive. The judgment, after *remittitur*, in the trial court, was $24,840.40. Plaintiff was thirty-nine years old, earned $5.15 per day, and was working six days per week prior to his injury. He was injured on July 16th and went back to work on September 25th. He worked until December 7th. Plaintiff said that he quit work because he was unable to continue. Defendant says that he was replaced under the seniority rule. Plaintiff said that from September to December he was on a run where the work was lighter than before. Defendant says that there was no difference in the work plaintiff did before and after he was injured. Plaintiff's evidence showed that after he quit work he had paid or incurred hospital and medical expenses amounting to about $3000.

Physicians who testified in plaintiff's behalf, testified that their X-ray pictures showed that he sustained a fracture of the fifth lumbar vertebra (a compressed fracture of its body and also a fracture of its transverse process) and a fracture of the upper segment of the sacrum; that there was a separation of the sacroiliac joint, and a rotation and tilting of the lumbar spine to the right side; and that "he had a rigid spine and muscles and ankylosed condition." Plaintiff's medical testimony also showed an injury to the bones of his left ankle, causing a displacement of and a breaking down of the arch of the left foot so that he had a first degree flat foot. This evidence further showed that the normal functions and movements of plaintiff's back had been seriously impaired; that he has been obliged to wear a brace upon his back to compensate for the functional disability to his spine; and that he has been rendered permanently unable to walk without assistance. One of plaintiff's doctors stated his opinion to be that "there has been an injury to the lower portion of the spine which has caused serious disturbance in all of the nerves;" that "it is only a question of a few years until plaintiff is totally paralyzed from his waist down;" and that "his condition is 80 per cent worse than when I first saw him." Defendant's medical testimony was to the effect that neither plaintiff's X-rays, nor those made when defendant's doctors examined him, showed any fractures or displacement of the sacroiliac joint or of the ankle bones.

Plaintiff's evidence is sufficient to show that he is permanently disabled. The same judge, who presided at the last previous trial and then required a *remittitur* of $29,000, after hearing this trial ordered a *remittitur* of $20,000 from a verdict of the same amount. Plaintiff's medical evidence tended to show that his condition had continued and would continue to get worse. It is true that there was a sharp conflict between the doctors who testified for plaintiff and those who testified for defendant as to what the X-ray pictures showed about fractures. However, we must consider the facts, shown by the evidence must favorable to plaintiff which was definite and positive,

to be now settled in plaintiff's favor by the verdict. The evidence was sufficient to show a disabling sacroiliac injury, and fractures of the sacrum and a vertebra which resulted in serious injury to the spinal nerves. The judgment is for a large amount, perhaps the very maximum that could be sustained. However, considering plaintiff's annual earnings at about $1600 per year, according to the statutory tables on the basis of an annuity of six per cent, their present worth would be $19,392. Considering also plaintiff's medical and hospital expenses and his pain and suffering shown, with his permanent total disability, we cannot hold this verdict, as reduced by *remittitur*, to be excessive under the evidence before us favorable to plaintiff. [See Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S. W. (2d). 311; Rouchene v. Gamble Const. Co., 338 Mo. 123, 89 S. W. (2d) 58; Dodson v. Gate City Oil Co., 338 Mo. 183, 88 S. W. (2d) 866; Gately v. St. L.-S. F. Railroad Co., 332 Mo. 1, 56 S. W. (2d) 54; Wack v. Schoenberg Mfg. Co., 331 Mo. 197, 53 S. W. (2d) 28; Ramey v. Mo. Pac. Ry. Co., 323 Mo. 662, 21 S. W. (2d) 873; Span v. Jackson-Walker Coal & Mining Co., 322 Mo. 158, 16 S. W. (2d) 190.] We are usually reluctant to order a further reduction after the trial court has considered and passed upon the matter and once substantially reduced the amount. [Schroeder v. Wells (Mo.), 298 S. W. 806.] Since the learned trial judge in the case had the advantage of having the parties and witnesses before him, and twice hearing all their evidence and twice considered the matter in the light thereof, we will defer to his judgment.

The judgment is affirmed. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.